Good morning, Your Honors. May it please the Court, my name is Timothy Rustello of the law firm of Holland and Hart, and together with my co-counsel Daniel Foley of the firm Foley & Foley, we represent the family of Aaron DeLew. I would like to reserve three for the second time in 10 years on behalf of the family of Aaron DeLew. They have meritorious claims against the defendants for covering up the true circumstances surrounding the death of Aaron, which occurred 14 years ago next month. NHP troopers were charged with the investigation of a possible felony DUI manslaughter involving a police officer's wife, and they took actions and made choices that infringed upon the DeLew's constitutional rights. Our case is supported by a comprehensive body of facts, facts that are drawn, facts that include facts drawn by inference. The district court's summary judgment has at least two fatal flaws. First, it fails to apply the proper legal standards by weighing the evidence, making credibility determinations, drawing inferences in favor of the defendants, and viewing the light – excuse me – viewing the evidence in the light most favorable to the defendants and not to the nonmoving party. Mr. Chief Justice, I tried some of these cases when I was a lawyer, and it was always helpful to me as a plaintiff's lawyer if there had been a criminal prosecution and I could look at what evidence was developed in the criminal investigation and all. It was very helpful. Now, I was trying to figure out the theory of your case because you've been able to sue the – what's their name? The NHP troopers. What's the name of the lady? Wagner? Yes. Yeah, you sued Wagner, and you settled with her for the policy limits. And you sued the with whom you eventually settled. So you – and you brought this suit against the Nevada Highway Patrol. So you brought actions. But what is it that gives you a constitutional right to have the authorities not – well, maybe you're saying they concealed evidence that otherwise you could have found as you prosecuted your case. I'm not sure exactly what the claim is that you have. Well, Judge Thompson, that is exactly part of the claim. And as this Court held ten years ago, the Dulues, under their complaint, have stated cognizable Section 19A of the Criminal Code, Section 183 claims based upon the facts that are alleged in the complaint. You're deflating them from getting to court or something. You're impinging on their ability to try their case. That's right. The primary constitutional infringement relates to the right to access to court. And as this Court held in Dulu, there is a claim for relief for infringement upon the access to court. And that – and that – your case, Dulu 1, was subsequently cited by the Supreme Court in Christopher v. Harberry, recognizing that there is such a constitutional right that may be infringed through an official cover-up. And even if the underlying case is settled, there is still a claim for relief. So it's part of your contention that because there was a cover-up, you were denied the right to access court. And the – the – the damages or injury is that although you recovered the $100,000 from the rights and have some sort of settlement with METCO, the family has never been fully compensated because the person's – you've never been able to have your day in court to prove that the persons who you think are responsible or principally responsible for the cover-up are liable to the family. That's correct, Judge. We're not. So that's your theory. So when you say the judge applied the wrong summary judgment standard and weighed the disputed facts, what's helpful to me is if you tell me what's the – what is the – what evidence creates the disputed fact, like what evidence is on each side that the district court – you argue the district court weighed and that it shouldn't have. Okay. Let me give you seven categories or seven evidentiary events which I believe at a minimum create a disputed issue of material fact, if not present a compelling case in communication from METRO, that METRO needed NHP to take over the investigation of a DUI fatality involving a METRO police officer's wife who had been drinking. Number two, NHP took control of the crime scene, the physical evidence – Did they dispute those facts? Actually, I – they didn't respond on that particular – So you're saying if you – if those facts are undisputed, then the reasonable inference that should be drawn is in favor of the moving party. That's right. Okay. Well, what facts are – is it the Wagner declaration that – where he says he was told not to – Well, Judge, it really – it's not that clear to us, the appellants. The NHP asserted 21 undisputed facts. We then responded and presented evidence that at least 16 of those material disputed facts – of those allegedly undisputed facts were in fact disputed. That's in the record in our opposition brief. We prepared a separate, clean statement. You had evidence that places those facts in dispute. That's right. That's right. Give us a couple of examples that relate exclusively to after the NHP officers arrive at the scene. For example, they claim that they did not delay the testing of Mrs. Wagner's blood alcohol level. Well, it happened at – within an hour and 20 minutes of when they first arrived. And within one hour of when the designated investigator arrived. Well, an hour and 10 minutes. That's very close, Judge Bolton. But they had a preliminary breathalyzer device at the scene. Who did? Nevada Highway Patrol. They had a preliminary breathalyzer device at the scene. We presented evidence of that. And they failed to even use it. What difference would it have made when they went ahead and had the blood tested? Well, because when they took the blood test, three hours and 13 minutes after the collision and an hour and 25 minutes after they arrived, they only did a single partial blood draw when NHP policies and procedures required multiple blood draws, at least two blood draws separated in time. If you don't do that, Judge, what happens is it makes it impossible to ever determine the blood alcohol level at the time of the collision. You can't just base it on a single blood test. You take multiple blood tests, at least two. Why can't you base it on a single blood test? Well, because every human being is different and has a different metabolic rate and dissipates and absorbs alcohol at different rates. And they're substantial. It's a substantial range. And we have expert testimony, the leading expert in the country, Dr. Herbert Moskowitz, whose affidavit explains this concept better than I can explain it. It creates an issue of fact that for what was the issue of genuine issue of material fact that it creates was, was there a legitimate reason for the delay and was it consistent with police practices or was it motivated to cover up the culpability of the, I guess, NHP's officer's wife? Precisely, Judge. So that's the issue that you're going to. But you did submit an expert declaration that explains all of this. Absolutely. We submitted eight expert and lay declarations and affidavits, three of them from nationally recognized law enforcement experts, which Well, let me turn to some of those. There has been criticisms of the accident investigation report that was done by NHP. You talk about how he didn't record the drag sled measurements. The officer testified, as the other officer did it, he told me what it was, I did the measurements, what the point is of doing those measurements. I did not record on my accident investigation report the drag sled measurements. But I put the result of my calculation down. Isn't the criticism then just that you negligently failed, that you could have made a better report? But to get a constitutional violation, where is the evidence that that was done with the motive of denying the Deleuze an effective remedy against the alleged impaired driver who committed the negligent homicide? The evidence, Judge, is drawn from the comparison of the way that NHP troopers always handled DUI fatal traffic collisions to how they handled this case. The deviations and departures were so substantial, so significant, so extraordinary, that one reasonable inference is that the motive must have been to protect Officer Wagner's wife from criminal and civil prosecution. But is there really evidence that when NHP arrived on the scene, that they believed it was a felony DUI? Absolutely. In the very first communication between NHP supervisors at 8.25 p.m. or 8.30 p.m. that evening, NHP supervisors were informed by Metro supervisors that there was a fatality, one of our citizens was lying in the street dead, it involved an officer's wife, and the officer's wife had been drinking and driving. So they knew at 8.30 p.m. that there was a hot potato out there. What they knew was that there was a possibility of an impaired driver. That's right. And they got to the scene, Wingard first, the young trooper, not the investigator. He detects an odor of alcohol. When the investigator arrives, he tells them about it. An HGN is done, which does not reveal the signs, but they ask Mrs. Wagner if she would consent to a voluntary blood draw, and then they take her to the hospital and get it. Where does that show some conspiracy to suppress evidence? It appears like despite the fact that they may not have had any probable cause to believe that she committed a felony, they went ahead and did the alcohol investigation anyway based on her voluntary consent, because it doesn't appear that at 9.20 they had sufficient evidence to force a blood test or a breath test. I beg to differ, Judge, and I would refer you to the expert affidavit of Webster at the record at page 467. He worked for NHP, did more DUI arrests than any trooper in Nevada, and he has testified unequivocally that as soon as the officers arrived, you don't wait for the accident reconstructionist to arrive. You smell alcohol, you see someone lying in the street, and you immediately do the full battery of standard field sobriety tests, which they did not do, and if you're going to do the horizontal nystagmus test, you record it on this form exactly what the observations were, which they did not do, and Webster testified in his declaration that what they did was just such a deviation and departure that the inference, or at least we draw the inference, that they must have been motivated by the goal of protecting... I think what your argument is is that's one inference that can be drawn, and there's another inference that can be drawn, but on summary judgment, that isn't the judge's decision to make. That's a jury decision. That's right, Judge. That's your real argument, right? That's right, Judge Horton. And without due respect, neither is this Court's province to weigh that type of evidence on a summary judgment order. So I see that my time is up. Thank you. Good morning. Jill Davis on behalf of NHP. The district's order was clear that the plaintiffs failed to uncover any admissible evidence that Metro and NHP covered up or conspired to cover up the true facts surrounding Aaron DeLue's death. All right. So what about the deposition testimony of Wagner? Isn't that admissible evidence that he would testify to, that he was told not to, well, really, not to say anything about the fact that he believed that, at the time that he believed that the NHP officer's wife had been drinking? I'm sorry. Which person's deposition? Wagner. His deposition testimony, what he was told not to say. I didn't believe he was told not to say. He didn't say anything. Have you read it recently? I did, if you could. Okay. All right. So you smelled alcohol on her breath, yes. You smelled alcohol on her breath, the person, yes. And did you look, did you perform any, okay. Well, a Metro officer came up to me, I can't remember if it was her husband or her husband's friend, one of the two. I believe it was the one wearing the white shirt. He stepped next to me and said, oh, that odor, don't worry about that. And he just kind of said, okay. And then he goes on and he explains. He said he felt uncomfortable. It was an uncomfortable situation. It was a little bit odd coming up to another officer and say, you know, his wife's been drinking. He said, you know, this kind of complicates things. So his testimony is that he felt pressure to hide the fact that he believed the wife had been drinking. Yeah, I'm sorry, I misheard you before. It's just his opinion of how he felt, but he still continued on with it. Well, he was at, he was one of the first people at the scene, right? Correct. He was there. He saw the immediate aftermath and he smelled alcohol on the Metro officer's wife's breath, right? Correct. Now, but yet he was told by either the officer himself or his friend, oh, never mind, don't worry about that. Correct. He was told that by Lieutenant Jensen offered up, who was a Metro officer said that. But isn't that evidence? I guess my only question is my, I'm not saying, I don't think necessarily that there was a cover up or not, but that is admissible evidence that one, at least one of the officers investigating was told not to say anything. Correct. That's an, by Metro making a comment aloud, maybe it could be offered up as a thought of maybe there's some conspiracy trying to occur between Metro and NHP, but NHP doesn't go anywhere near that. And NHP continues on with the investigation, just one officer's statement that you smelled alcohol off. There's other evidence that they allowed, contrary to all of their policies, they allowed her to go home before she had, went to the hospital and had a test. And she, you know, obviously, and they didn't conduct, I mean, if you read the expert testimony, they acted, NHP acted inconsistently with every guideline for how to handle a situation where it's suspected, where there's a felony murder, there's a death. I don't mean felony murder, but there's a death and the person who caused it probably was drinking. They believe that she was not, this was not a felony DUI because there was no evidence that she was intoxicated when this accident occurred. I mean, by the time NHP arrives, it's two hours later and Metro's been. You're saying no evidence. I say Wagner testified that she had alcohol in her breath. Correct. Isn't that evidence? You just said it was evidence. That is evidence. Okay. I mean, I'm not contesting that it's not evidence, but there was no. So why not let it go to a jury? You'd be exonerated in all this. Because there's no need to go to a jury. I mean, because there's, the whole issue was you needed to, in order for their claim to go forward, you have to find that there was a conspiracy between NHP and Metro. NHP did continue the investigation based upon the knowledge it found during its investigation. They do have a wine guard, trooper wine guard, who smells the alcohol on Mrs. Wagner's breath, reports it to the sergeants. Sergeants at both Metro and NHP, they say, do what you need to do. Then he waits for Trooper Smith, who's the senior fatal investigator officer for NHP to, tells him as soon as he arrives, which is about ten minutes after he does, Mrs. Wagner has alcohol on her breath. Trooper Smith then goes, speaks to Mrs. Wagner, gives her an HGN test, which she passes. He says, you know, you've passed. Well, you know, typically there's not direct evidence of a conspiracy. I mean, typically there's only circumstantial evidence. And I think what I hear the Deleuze arguing is that there's all these facts that, to which they've introduced expert testimony that show that NHP did not act in accordance with its procedures. Now, perhaps the jury could draw an inference that there was an agreement between Metro and NHP that night or not. Usually conspiracies are proven by circumstantial evidence. Correct, but the Deleuze are only offering up the expert testimony, saying that the procedures, they say, weren't followed exactly. But that really goes to a reasonable test, and that would go to more of a quality of qualified immunity issues, which the district court below never went that far. They just went to the conspiracy level to get the expert testimony. And it would all be whether, you know, the troopers believe that their investigation was reasonable based upon the circumstances, and you need to analyze it under Saucier v. Katz. They can't just bring in their expert witnesses saying this was, you know, not our usual procedure for this type of investigation to continue on as a material fact. That's not where it would come into play. It would come into play with a qualified immunity issue, which is what a district court judge could rule on. And he just didn't feel the need to go to that level. I mean, he never made it that far. I mean, he just said there was no conspiracy found based on all this evidence that was presented before him. Ms. Davis, apparently there was this sort of a statement, it's okay or something, about the blood alcohol, because the person may have smelled on a fellow officer who had been drinking or something like that, there was some reason given. But in any event, they did take a blood test. Now, it was delayed, and they didn't do the breath test, even though they had the machine right there, could have done the breath test, and they delayed the blood test. When they got the blood test, they got a .04. Now, with that, can a plaintiff build back to the time of the accident and have a, I guess, the reconstruction expert that Mr. Vestella may have been referring to, and say, well, then at the time of the accident, the blood would have been this level. Isn't that the way you do it? You could in that case. It would be more for the civil case for against Mrs. Wagner, because Nevada is not a Dahlberg state, so there's a little more leeway with expert testimony. And in our excerpt from the record, I think there was evidence of another case where something similar occurred where there weren't two blood draws done, because when there are two blood draws done, it's easier for them to mathematically calculate out, you know, what your blood alcohol level would have been, you know, at the 715 hour. It would have been higher at the time of the accident. It would have been higher at the time of the accident, but you could still have somebody come in, an expert. It's going to be more of a guesstimate, because everyone, as counsel said, doesn't, you know, metabolize alcohol the same way, but you could get a good enough guesstimate so that you could go into civil proceeding and have a jury decide in the Wagner civil case, you know, was alcohol maybe in play, should this have been analyzed more, an expert could have extrapolated based on the height and weight of Mrs. Wagner. Well, what about these declarations from these experts that say they've, you know, investigated a lot of accidents, they know how it's done, and this, the circumstances of this event indicate that there was a cover-up. I mean, that's what the declarations seem to say. Are those admissible? Is that admissible evidence? That's not admissible evidence to the material facts. That really just does go towards qualified immunity. Were the officers under the analysis reasonable in how they performed this investigation based upon the facts that they had at hand? I don't believe that you can just bring experts in on this sort of police procedure aspect and just say, oh, it's a material fact because of an expert who says that under the police procedure, you should have done two blood draws, when in this case she wasn't even under arrest for a felony DUI, which is normally where that comes into play. Well, would the ultimate conclusion, if you will, of the expert, would that be admissible into evidence? It seems to me that there are some times that that actually can come in, and then it goes to the question of the weight to give that conclusion. I've seen that more in medical cases. When I researched this on ---- Yeah. That's what I'm thinking. I'm thinking of a medical case, really. I looked through my research medical cases that came in for that. But when I researched everything about police conspiracy and aspects regarding everything, I mean, there were a number of cases out there that stated that this does go to qualified immunity, and that's where I came up with that argument, is that if you're going to go through and say a police investigation was not done as it should have been done, that's just going to go to qualified immunity, whether a reasonable trooper under these circumstances would have understood that he was violating the Duluth's constitutional right of access to the court. And that's where the expert testimony would come in, and the district court could weigh that. That would just be something for the judge. That would not be something to go to a jury. There's no need to go to a jury trial on this case. Well, I think what you're saying is that that evidence could weigh toward the decision as to whether there was a cover-up, or are you not saying that? I'm not saying that. We just go ---- I mean, more of the disqualified immunity on that aspect, whether there was a conspiracy, not just have an expert come on in and state that, oh, I don't think all these procedures were done properly. Even when you read the experts' affidavits, they are pretty much focusing on Metro. Very little is said about NHP, for the most part, when you go through point by point. It's just not admissible for coming in and stating that indicates a material fact about what occurred. I mean, what occurred is clear. It's on the record. I don't think there was any reason for the district court below to, you know, analyze what was happening in the expert witness affidavits. And then ---- Okay. Let me just ---- so the NHP actually filled out the traffic accident report, and three and a half hours or so afterwards, they actually did send a new officer, which delayed the testing all the more, with the driver of the car to the hospital to have the blood taken, and it was .04. And but nowhere on this report does it even mention that there was alcohol consumed, yet we know that there was ---- she had a .04 level, at least three quarters after the events. Under contributing factors, the only one that's marked is driver inattention. Correct. Yet, even though there is a contributing factor of driver inattention, the report concludes that the bicyclist was 100% at fault and that the driver of the car was not at fault at all. Correct. That was the finding. They didn't mark down when you ---- through the deposition testimony of Trooper Smith, who authored the report, that nobody felt that she was intoxicated at the time of the accident, because all of their reasoning when NHP showed up, they weren't, you know. How do you explain a conclusion that a contributing factor of the accident was driver inattention and yet ascribe 100% of the fault to the bicyclist? From what I could gather, it was just how everything came into play. I mean, even if there's driver inattention, it's sort of automatic. If you're doing ---- like a car accident, if you're crossing the right-of-way, even if the other driver's inattentive, you have still violated the law, and therefore you are at fault. And that's what appeared from reading all the depositions of all the officers and the troopers, that was a summation. This is how the, you know, she's driving down the road. You have the bicyclist here. They hit. The bicyclist was at fault based on just the normal police procedures in investigating an accident that way. They didn't elaborate any more on that. I'm going to just analyze where the path of the vehicle, path of the bike, and what occurred. Thank you. Thank you. Judge Thompson, with respect to your extrapolation question, it is possible if a blood alcohol test is taken shortly thereafter, a particular incident, to extrapolate backwards. But once you go hours later, you cannot do that with a reasonable degree of certainty unless you take two draws separated by time, because you don't know how fast the person is metabolizing the alcohol. Oh, I see. Okay. Okay. Well, the other thing is I suppose she could have gone home and had a glass of wine or something. And that was the second point I was going to make. Who knows what she did when she went home? She could have gone home, eaten food, consumed alcohol, and then testified, well, the reason why my B.A. was such and such is because I had a beer when I went home. Now ‑‑ You're over your time, but just sum up and make your last point. I just wanted to point out that the district court said that there is nothing that our assertions are seen by the district court as little more than gross speculation and conjecture. And I just wanted to leave the court with the thought that reading this record, reading the judge's order and his statements, isn't it 14 years after this litigation was started, I believe the Duluths have a right to have their case heard and resolved by a jury before a neutral judge, and we ask that you grant that request. I had one question I do want to ask you. What about the admissibility of this opinion evidence from the experts that say that this was ‑‑ I think they said it was evidence of a coverup. Well, as you know, Rule 703 does allow an expert to testify on the ultimate issues in the case. Yeah. We don't need any expert to testify that all this evidence put together shows that they intended to cover up. And I wouldn't ‑‑ I doubt that I would even attempt to do that, because the evidence is so strong, the inferential and circumstantial evidence is so strong, I think most reasonable jurors are going to reach that conclusion by themselves. So in answer to your question, I think it would come down to the trial judge deciding whether or not that was probative and helpful to the jury or not. Okay. Thank you, Judge. Thank you, Counsel. Duluth v. Adamson is submitted, and we will adjourn the session of the court. All right. This court discussion stands adjourned. Thank you. Thank you. Is that a yes or no? No. No. Good work. Good work. Good work. Yeah. Yeah. Great. Thank you. Thank you. I appreciate it. Thank you. Thanks.  Thank you. Thank you.
judges: Thompson, Wardlaw, Bolton